In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re The UNITED NEW JERSEY RAILROAD AND CANAL CO., Secondary Debtor.

In re BEECH CREEK RAILROAD COMPANY, Secondary Debtor.

In re The CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY COMPANY, Secondary Debtor.

In re The CLEVELAND & PITTSBURGH RAILROAD COMPANY, Secondary Debtor.

In re The CONNECTING RAILWAY COMPANY, Secondary Debtor.

In re The DELAWARE RAILROAD COMPANY, Secondary Debtor.

In re ERIE AND PITTSBURGH RAILROAD COMPANY, Secondary Debtor.

In re The MICHIGAN CENTRAL RAILROAD, Secondary Debtor.

In re The NORTHERN CENTRAL RAILWAY COMPANY, Secondary Debtor.

In re PENNDEL COMPANY, Secondary Debtor.

In re The PHILADELPHIA, BALTIMORE & WASHINGTON RAILROAD COMPANY, Secondary Debtor.

In re The PHILADELPHIA & TRENTON RAILROAD COMPANY, Secondary Debtor.

In re The PITTSBURGH, YOUNGSTOWN AND ASHTABULA RAILWAY COMPANY, Secondary Debtor.

In re PITTSBURGH, FORT WAYNE AND CHICAGO RAILWAY COMPANY, Secondary Debtor.

In re UNION RAILROAD COMPANY OF BALTIMORE, Secondary Debtor.

In re Proceedings Pursuant to § 207(B) of the REGIONAL RAIL REORGANIZATION ACT OF 1973.

Nos. 70–347, 70–347–A to 70–347–O.

United States District Court, E. D. Pennsylvania.

May 2, 1974.

Robert Lipkin, Carl Helmetag, Jr., and John DePodesta, Covington & Burling by W. Crosby Roper, Jr., Philadelphia, Pa., for the trustees Penn Central Transportation Co.

Walsh & Frisch by E. Roger Frisch, New York City, for George Betz, trustee of the properties of Beech Creek Railroad Co., Erie & Pittsburgh Railway Co., and Penndel Co., and Albert B. Huttig, trustee of the property of Cleveland, Cincinnati, Chicago & St. Louis Railway Co.

Proskauer, Rose, Goetz & Mendelsohn by Philip M. Hahn and Howard Lefkowitz, New York City, for The Bank of New York, as indenture trustee.

Kirkland & Ellis, by Cornelius J. Harrington, Jr., Chicago, Ill., Sp. Counsel for Albert B. Huttig, trustee of the Cleveland, Cincinnati, Chicago & St. Louis Railway Co., secondary debtor.

Chatz, Sugarman & Abrams, by Nicholas G. Dozoryst, II, Chicago, Ill., for American Nat. Bank & Trust Co. of Chicago.

White & Case, by Donald M. Wilkinson, Robert L. Clare, III, and Edmond Gregorian, New York City, for Bankers Trust Co., as indenture trustee.

Jerome E. Sharfman and Stuart G. Meister, Washington, D.C. for the United States and U.S. Dept. of Transportation.

MacCoy, Evans & Lewis, by Herbert G. Schick, Philadelphia, Pa., for Pittsburgh, Youngstown & Ashtabula Railway Co., and Michigan Central Railroad Co.

Richards, Layton & Finger by Richard G. Elliott, Jr., Wilmington, Del. for Wilmington Trust Co.

Sharon, Pierson, Semmes, Crolius & Finley by Ross Hamachek, Washington, D.C., for Pennsylvania Co.

Walsh & Frisch by Jerome K. Walsh, New York City, for Pittsburgh, Fort Wayne & Chicago Railway Co., and Cleveland & Pittsburgh Railroad Co.

Robert S. Grodinsky, Philadelphia, Pa., for minority stockholders of Cleveland & Pittsburgh Railroad Co.

Ballard, Spahr, Andrews & Ingersoll by Alan Fellheimer, Philadelphia, Pa., for Girard Trust Bank, indenture trustee.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of New York.

Ewing & Cohen by William H. Ewing, Philadelphia, Pa., and Mitchell L. Bach, for The United New Jersey Railroad & Canal Co., Connecting Ry. Co., Philadelphia, Baltimore & Washington Railroad Co. and Delaware Railroad Co.

Morgan, Lewis & Bockius by John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank, indenture trustee.

Reed, Smith, Shaw & McClay by Andrew N. Farley, Pittsburgh, Pa., for Mellon Bank, N. A.

Ewing & Cohen by William H. Ewing for secondary debtors Philadelphia, Pa., and the Connecting Ry. Co.

Morgan, Lewis & Bockius by Edward B. Cloues, II, Philadelphia, Pa., for Manufacturers Hanover Trust Co.

MacCoy, Evans & Lewis, by Mark Willcox, Jr., and Herbert G. Schick, Philadelphia, Pa., for The Philadelphia & Trenton Railroad Co., Union Railroad

Co. of Baltimore, and The Northern Central Railroad Co.

Leroy D. Touchton, Delran, N.J., for the State of New Jersey.

## MEMORANDUM

FULLAM, District Judge.

Section 207(b) of the Regional Rail Reorganization Act of 1973 (hereinafter "the Act") directs that certain findings be made in each pending railroad reorganization proceeding in the Midwest and Northeast. Application of the Act to the proceedings of the Secondary Debtors poses many legal and factual problems. In large measure, these problems are common to all of the Secondary Debtors, and can conveniently be considered together.

### I. *Procedural Background*

For almost a century it has been a frequent practice of railroad companies seeking to expand into other territories to achieve this goal by means of long term leases of existing rail lines.[1] Use of the operating property can thereby be acquired without the problems and complexities of full-blown corporate consolidations. Generally, rental of the leased line includes servicing the lessor's debt, payments in an amount equal to taxes and the lessor's corporate expenses, and a fixed or contingent annual rental available for distribution to the holders of the lessor's equity securities. Today, about half of the Penn Central's operating system is owned by Penn Central, and the remainder is leased to Penn Central by numerous lessor companies. Penn Central's predecessors successfully followed the industry-wide practice of acquiring substantial stock holdings in important leased lines. Although many of Penn Central's leased line lessors own important property, only 15 lessor companies are owned or controlled by Penn Central. However, these 15 companies own 9,304 route miles of the Debtor's system.

Railroad leases are, of course, executory contracts, and subject to disaffirmance by a § 77 trustee; and even in the event the lease is affirmed by a § 77 trustee, the lease may be rejected in the reorganization plan. § 77(b). Moreover, if a lease is disaffirmed, operations after the initiation of the § 77 proceeding are deemed to have been for the account of the lessor, and as a result the lessor may be obligated to make up losses sustained by the lessee in operating the leased line.[2] In the Penn Central case, pending decisions by the Trustees to affirm or disaffirm leases, rental payments have been deferred.

Deferral of rental payments to lessors exposed the lessors to the possibility of defaulting on their own obligations, thereby triggering action by the lessor's creditors to enforce their rights against the lessors and their property. On the other hand, many of the parties felt that so long as Penn Central continued to operate the leased properties, and so long as the leases were not disaffirmed, this Court's jurisdiction to protect Penn Central's leasehold interest provided shelter for the lessors as well. In order to maintain a degree of control over the status of leased lines, at an early stage of the Penn Central reorganization virtually all of the interested parties agreed to the entry of a "status quo" order in the Penn Central proceeding, to the effect that no one could take action to enforce any claims against the lessors, except upon 14 days' advance notice to all other parties (Order No. 170). Thus, an opportunity was provided the parties to apply to this Court for specific protection, if appropriate.

---

1. An exhaustive treatment of the railroad lease is found in II Dewing, The Financial Policy of Corporations, ch. 31 (5th ed. 1953).

2. The treatment of railroad leases in § 77 proceedings is discussed in In re Penn Central Transportation Company (Sale of Park Avenue Properties), 354 F.Supp. 717 (E.D. Pa.1972), aff'd in part, 484 F.2d 323, 334 (3d Cir. 1973).

Order No. 1, and additional orders thereafter, stated and extended the time within which the Trustees were obligated to make decisions concerning affirmance of executory contracts. The Trustees submitted reports (Document Nos. 2466, 2637, 3029, 4428) explaining the significant difficulties they were encountering in attempting to determine whether the estate would be benefitted by affirmance of each of the leased line leases. Eventually the time within which to act on leased lines was extended until further order of this Court (Order No. 948). To date, only the New York & Harlem Railroad Company lease, which includes the land underlying portions of the Penn Central's substantial real estate holdings in the Park Avenue area of New York City, has been affirmed. In all other cases (except certain leases of Canadian Lines, not part of this reorganization proceeding), Penn Central has paid no rent under the leases since bankruptcy, and the leases have neither been affirmed nor rejected by the Penn Central Trustees.

From time to time, as the Penn Central proceedings continued, sales of excess properties owned by leased lines were effectuated. In some instances, it became necessary to resort to fairly cumbersome proceedings in order to be certain that the purchaser would acquire clear title, with assurance that liens against the lessors' reversionary rights had been discharged from the property. Yet, on the whole, the situation of the leased lines remained relatively stable compared to other aspects of the Penn Central proceeding.

In 1973, it became apparent that, in the absence of Congressional action, Penn Central might be unable to continue operations. The Penn Central Trustees filed a proposed plan of reorganization which contemplated termination of rail operations, disposition of its rail property within a short time, and reorganizing around the proceeds plus the non-rail assets. On July 12 and 14, 1973, the 15 lessor companies which are owned or controlled by Penn Central filed separate reorganization petitions pursuant to § 77(a) of the Bankruptcy Act, seeking reorganization as part of or in connection with the plan of reorganization of the Penn Central. These 15 leased lines are hereinafter referred to as the "Secondary Debtors." Initially, in an effort to minimize the overall costs of the reorganization proceedings, I withheld appointment of trustees for the Secondary Debtors, and permitted the Secondary Debtors to function as debtors in possession. The passage of the 1973 Act and other intervening developments made it appear likely that the future course of the reorganization proceedings might well be such that the interests of the Secondary Debtors could best be protected by appointment of trustees. Accordingly, on March 11, 1974, trustees were appointed for all but one of the Secondary Debtors. In some instances, the same individual was designated for several Secondary Debtors, having similar, or at least non-conflicting, interests. So that the designated trustees could begin operations immediately, they were also designated temporary receivers, pending final action by the Interstate Commerce Commission upon their ratification. At present writing, the Commission has ratified five of the Trustees, but has announced no decision as to the other two.

One of the Secondary Debtors, Connecting Railroad, continues in reorganization as a debtor in possession, without a trustee, pursuant to a stipulation worked out between all of the parties interested in that lessor.

## II. Necessity for Separate § 207(b) Findings for Each Secondary Debtor

The Act requires a finding as to reorganizability with regard to every "railroad in reorganization" (§ 207(b)). That term is defined as "a railroad which is subject to a bankruptcy proceeding and which has not been determined by a court to be reorganizable or not subject to reorganization [under § 207(b)]." Section 102(12). And the

term "railroad" is defined as "a common carrier by railroad as defined in § 1(3) of part I of the Interstate Commerce Act (49 U.S.C. § 1(3))" § 102(11).

Initially, the government contended that § 207(b) findings would be inappropriate in the cases of the Secondary Debtors, because they were not "railroads in reorganization" within the meaning of the statute, since they were not "railroads" in the sense of being operating carriers. The government has now expressly abandoned that contention, perhaps because, if the contention were accepted, the possibility of acquisition of the lessors' interests in rail property through mandatory conveyance would be jeopardized. I am persuaded that the government's original contention was without merit in any event. Leased lines have always been regarded as "railroads" for purposes of the Interstate Commerce Act and § 77(a) of the Bankruptcy Act. *See, e. g.,* Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118 (1970); Freeman v. Mulcahy, 250 F.2d 463, 466 (1st Cir. 1957). This Court has previously rejected similar arguments based upon unduly narrow readings of the Interstate Commerce Act. *See* Memorandum and Order No. 11, *United New Jersey Railroad & Canal Company* proceedings.

The principal contention of the government now appears to be that all of the Secondary Debtors must be automatically found non-reorganizable if the Penn Central itself is found not to be reorganizable. The basis for this argument is the assertion that, having petitioned under § 77(a) of the Bankruptcy Act for reorganization "as part of, or in connection with" a plan of reorganization of Penn Central, the Secondary Debtors cannot be permitted to reorganize as an independent operating company or by sale of lease of the Secondary Debtor's property to another carrier.

■■ For purposes of discussion, I am prepared to assume that the government is correct in its assertion that a secondary debtor, by petitioning under §

77(a), casts its lot with that of the principal debtor, at least to some extent. In my view, this means that both companies are committed to working towards achieving plans of reorganization which are compatible with each other, and to do so according to a somewhat similar timetable. But this surely does not rule out the possibility that a secondary debtor may emerge as an independent, operating company. One can readily visualize many situations in which the joint or related plans for reorganization of both the primary and secondary debtor would contemplate reallocation of the rail system between them; or disaffirmance of a lease between them. Clearly, under such circumstances independent reorganization of secondary debtors is appropriate.

Decisions of the ICC in which the Commission declined to approve proposals for secondary debtors to "go it alone" after having sought reorganization with the principal debtor are not to the contrary. In re Missouri, Pacific Railway Co., 290 ICC 674 (1954) and 275 ICC 203 (1949); Chicago, Rock Island & Pacific Railway Reorganization, 244 ICC 329 (1937). It is apparent that those cases do not purport to establish or apply a general rule of law on the subject, but rather were decided on their respective facts. The first Circuit Court of Appeals has intimated a contrary view. Boston Terminal v. Mutual Savings Bank Group Committee, 127 F. 2d 707 (1st Cir. 1942).

I also find unacceptable the proposition that any attempt to reorganize a secondary debtor under § 77 would necessarily be incompatible with reorganization of Penn Central pursuant to the 1973 Act. This is simply a *non sequitur.* The ability of the Association to devise a Final System Plan, and to acquire the rail properties embraced within such plan would remain unchanged.

■ In short, I have concluded that, having found that Penn Central is not reorganizable within the meaning of § 207(b), I must nevertheless make sepa-

rate determinations for the Secondary Debtors, and may properly find some or all of them to be reorganizable.

### III. Jurisdiction to Make § 207(b) Findings

■ As set forth in the corresponding portion of the Penn Central proceedings (Memorandum Findings and Order No. 1543), it is my view that a reorganization court clearly has jurisdiction to make findings with respect to the reorganizability of the debtor. Since I have concluded that some of the Secondary Debtors are reorganizable, it becomes necessary to consider the remaining jurisdictional issue, left undecided in the Penn Central Opinion, namely, whether it is properly within the power of an Article III court to make findings with respect to the public interest.

> Section 207(b) requires the Court to " . . . decide whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. § 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act."

Read literally, this language does not leave anything to be decided on the public interest question, since the Court is required to decide *"that* the public interest would be better served by continuing the present reorganization proceedings." In context, however, it is apparent that Congress intended the Court to decide "whether" the public interest would thus be better served.

■ To the extent that Congress itself has defined the public interest, a court may presumably perform the judicial function of determining whether the facts of a particular case bring it within that definition. But it is, generally speaking, a legislative matter to deter-

mine what the public interest is, and that function may not be delegated to a court. In short, the jurisdictional issue boils down to a question of whether Congress has provided adequate standards for making the comparative judgment on public interest which is required by § 207(b).

■ On the assumption that Congress intended to act constitutionally, I conclude that the applicable standards are to be derived from the four corners of the 1973 Act itself. I recognize that certain expressions of Congressional intent in other related statutes may be helpful to the attempt to verify what Congress defines as the public interest. For example, the Interstate Commerce Act, and § 77 of the Bankruptcy Act, can properly be resorted to. But in the final analysis, since what is required is a comparison between § 77 proceedings and proceedings under the Act,[3] the most recent expression of Congressional intent (in the 1973 Act) must carry greater weight.

■ Perhaps the clearest indication of Congressional intent lies in its allocation of the burden of proof on this issue. In the first place, if the Court finds that the public interest would be equally well served under either method of reorganization, the procedures of the 1973 Act must be chosen. The same result follows if the Court is unable to make a decision on the subject. Other portions of § 207(b) provide:

> " . . . Because of the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act, each such court shall order that the reorganization be proceeded with pursuant to this Act unless it (1) has found that the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11

---

3. Actually, of course, the comparison is between a § 77 proceeding without resort to the Act, and a proceeding under § 77 as supplemented by the Act. Because of the language of § 207(b), however, it is convenient shorthand to discuss the issue as a comparison between two mutually exclusive procedures.

U.S.C. § 205) and that the public interest would be better served by such a reorganization than by reorganization under this Act . . . If a court does not enter an order or make a finding as required by this subsection, the reorganization shall be proceeded with pursuant to this Act. . . . "

Unquestionably, by this language, and by all of the provisions of the Act, including its preamble, Congress has expressed a decided preference for proceeding under the Act, rather than continuation of the § 77 proceedings.

Stated otherwise, by placing the burden of proof upon those who argue for continuation of the § 77 proceedings, while simultaneously failing to provide any standard by which a court might adjudge that course to be preferable, Congress has effectively deprived the court of any power to decide in favor of the § 77 proceeding.

I recognize that there may be constitutional difficulties which would arguably preclude giving effect to any such conclusive presumption. But in my judgment, that constitutional issue need not, and indeed cannot adequately, be considered except in conjunction with the "180-day" findings as to whether the 1973 Act process would be fair and equitable to the Debtor's estate. If the processes of the Act are fair and equitable, then a Congressional directive to utilize those procedures would presumably not violate constitutional rights.

It is, however, appropriate to register a few caveats at this point. This reasoning assumes that any infringement of constitutional rights which would flow from adoption of the Act's procedures, whether in terms of the values assigned to rail properties, or in terms of the values, form, and timing of the consideration to be received for such assets, would be reflected in the 180-day finding. Moreover, it might well prove constitutionally impermissible, in the case of a reorganizable debtor, to carry out the Congressional mandate that the proceedings must be dismissed if the

proceedings under the 1973 Act are found to be other than fair and equitable. But all of these matters can best be considered in the context of the 180-day proceedings.

Two other possible lines of approach would seem to lead to the same result expressed above. One is perhaps implicit in what has already been stated, namely, a holding that the Act does not provide adequate standards for determining the public interest, and therefore no finding on that subject can properly be made. The other would be to derive from the four corners of the Act an expression of Congressional intent that the principal public interest factors to be considered are the preservation and continuation of essential rail service in accordance with a valid regional plan. It would then arguably follow that, since the Secondary Debtors are not operating railroads, and since their interests in rail properties are equally available for inclusion in a final system plan irrespective of whether they proceed under § 77 or under the Act (since, among other reasons, all are controlled by Penn Central, which is a railroad in reorganization), it makes no difference to the public interest which statutory proceeding is followed. The net result would be that the Court would be unable to find that § 77 would better accord with the public interest.

No matter which approach is adopted, it would seem that any Secondary Debtor which is found to be reorganizable should nevertheless, for the present at least, proceed under the 1973 Act.

IV. *Feasibility of Making § 207(b) Findings*

Several factors make it extremely difficult to reach a rational conclusion as to the reorganizability of the Secondary Debtors. In the first place, their leases have neither been affirmed nor rejected. If the leases were affirmed, and if the Penn Central Trustees were able to pay the accrued and continuing rentals under the leases, obviously all of the Sec-

ondary Debtors could successfully reorganize. Indeed, in most cases their reorganization petitions could be dismissed as moot. And even if a particular lease were to be disaffirmed, if it should appear that the revenues derived from rail operations over the leased property exceeded the costs of operation, the lessor would have an administration claim against the Penn Central estate and would undoubtedly be able to reorganize eventually.

It is only with respect to the lessors whose operations have produced deficits that the issue would be in doubt; the Penn Central Trustees could ostensibly disaffirm the lease and assert a lien against the lessor's property to cover post-reorganization deficits.

The Penn Central Trustees have thus far been unable to take definitive action with respect to affirmance or rejection of leases of the Secondary Debtors. Initially, the principal reasons for this situation were the extreme complexity of the problems involved, the lack of adequate accounting information to form the basis of a judgment on the subject, the unavailability of cash to make the rental payments, and the fact that, for the most part, it was not in anyone's best interests to attempt to force a rejection of the lease. More recently, the enactment of the 1973 Act has made it virtually impossible for the Trustees to take definitive action on these leases. Until the final system plan is adopted, it will remain difficult to make valid judgments concerning the burdens and benefits of particular leases. Moreover, in view of the drastic changes in patterns of rail traffic which will presumably be one consequence of the Final System Plan, data derived from past and current operations seem likely to provide an uncertain guide for the future.

The Secondary Debtors have attempted to explore the question of reorganizability on several alternate theories. These include: (1) affirmance of the lease; (2) rejection of the lease, with continued operation by Penn Central; (3) rejection of the lease, with lease or sale of all or part of the rail properties to a profitable railroad; and (4) rejection of the lease followed by independent operation by the lessor. In attempting to pursue these alternatives, the Secondary Debtors were faced with a lack of pertinent information, and the insufficiency of time within which to develop the required information.

First, the inadequacies of available data must be discussed. The Penn Central system was operated as a single railroad. Except for certain capital items, as to which accounts had to be maintained pursuant to the terms of applicable leases or mortgage indentures, revenues and expenses were not separately accounted for under each lease. Beginning in about 1972, the Penn Central Trustees instituted the necessary accounting procedures so that the required raw data could be accumulated. After many months of effort, the Trustees' consultants, Wyer, Dick & Company, have recently completed a "segregation study" of all of the Secondary Debtors. It is important to emphasize just what this study is, and what it is not. It represents an attempt to allocate to each of the leased lines its proper share of revenues and expenses. Allocating revenues involve many judgment questions, and many costs are allocated on a basis of systemwide averages. Thus, there may be merit to the contention that in some instances the segregation studies may not accurately reflect actuality.

A segregation study of this kind is useful in determining the profitability or non-profitability of operations over a particular leased line. But its usefulness in determining whether independent operation of that leased line would be profitable or not is marginal at best.

What is needed to form a valid basis for determining whether a particular leased line could operate independently are severance studies, which analyze what traffic such an independently operated road could expect to retain or attract, what its revenues from such traffic would be, and what its costs would be if operated independently. No sever-

ance studies are available; at the earliest, none will be available before August of 1974.

To add to the difficulty, as noted above, severance studies based upon data derived from past and current operations are unlikely to reflect accurately the changes which can be expected to flow from implementation of the final system plan under the 1973 Act.

██ For all of these reasons, I am inclined to agree with the contention advanced by many of the parties that requiring a finding on reorganizability by May 2, 1974 represents a violation of procedural due process of law. But while I have grave doubts on that subject, I have concluded that such findings should be attempted anyway, for two reasons: (1) arguably, the procedural deficiency would amount to a due process violation only in the event of a finding of non-reorganizability, and (2) an erroneous refusal to make a finding could not be corrected later, whereas an inadequately supported or erroneous finding could be.

### V. *Reorganizability of the Secondary Debtors*

In each of the Secondary Debtors' proceedings, a separate document is being filed, setting forth what may be termed subsidiary findings as to the present situation and future prospects of each of the Secondary Debtors. My views on the ultimate question of reorganizability of the Secondary Debtors will be outlined here.

██ By entering Orders, less than ten months ago, approving the reorganization petitions of the Secondary Debtors as having been properly filed, in good faith, this Court necessarily espoused the view that the Secondary Debtors were probably reorganizable. As noted above, the Trustees of the Secondary Debtors have had only about one month in which to familiarize themselves with the affairs of their charges and analyze their respective prospects. There is every reason to believe that, in establishing the deadline for the first

decisions under § 207(b), Congress did not actually have in mind these special circumstances relating to the Secondary Debtors. It therefore seems reasonable to hold that the burden of proof should be upon those who seek to establish that the Secondary Debtors are not reorganizable within a reasonable time under § 77 of the Bankruptcy Act. There is nothing in the language of the 1973 Act which compels a different assignment of the burden of persuasion; and I should be reluctant to conclude that Congress, by enactment of the 1973 Act, intended to create a presumption against reorganizability, while at the same time including provisions which virtually rule out any prompt decisions with respect to affirmance or disaffirmance of the leases of the Secondary Debtors.

Somewhat related to the foregoing approach is my feeling that the concept of reorganization "on an income basis" may be somewhat different in the case of a lessor railroad than in the case of an operating railroad. Lessors can be expected to reorganize on an income basis by reason of income derived from lease of the property, rather than from operations. The identity of the lessee is not necessarily a crucial factor. Since most of these leases were negotiated many years ago, it is reasonable to suppose that, where substantial portions of the rail properties involved appear likely to remain essential for serving the public, equivalent arrangements could be worked out which could support reorganization of the lessors. In my view, a "reasonable time" for exploring these possibilities has not yet expired.

In my view, the evidence attempting to project independent operation of a Secondary Debtor has principally a negative relevance. That is to say, it should be considered primarily in order to identify and weed out situations in which, by reason of light density, or identification of most of the trackage as potentially excess (in the preliminary report of the Department of Transportation) and similar factors it appears that a reorganization which contemplates

continued operation of the property by someone is unlikely.

 Applying the approaches outlined above, I have concluded that, with the exception of the Beech Creek, Erie & Pittsburgh, and Penndel Companies, all of the Secondary Debtors appear to be reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act. In the case of the three exceptions, the evidence is such that I find myself unable to make a finding either way.

Separate orders will be entered in each of the Secondary Debtor's proceedings, in conformity with the conclusions expressed above.

### ORDER NO. 16

And now, this 2nd day of May, 1974, pursuant to § 207(b) of the Regional Rail Reorganization Act of 1973, it is ordered, and this Court finds, as follows:

1. That the above-named Secondary Debtor is reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act (11 U.S.C. § 205).

2. That the evidence available does not preponderate in favor of a finding that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization in accordance with the Regional Rail Reorganization Act of 1973; that the presumptions established by § 207(b) of said Act have not been overcome; and that therefore, until further Order of this Court, the reorganization of the above-named Secondary Debtor shall be conducted pursuant to the Regional Rail Reorganization Act of 1973 as well as the pertinent provisions of § 77 of the Bankruptcy Act.

THIS ORDER WAS ENTERED IN ALL SECONDARY DEBTORS EXCEPT BEECH CREEK, ERIE & PITTSBURGH, AND PENNDEL COMPANY.

### ORDER NO. 9

And now, this 2nd day of May, 1974, it is ordered, and the Court finds, that the record as a whole does not permit a decision at this time as to whether or not the above-named Secondary Debtor is reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act (11 U.S.C. § 205), within the meaning of § 207(b) of the Regional Rail Reorganization Act of 1973.

THIS ORDER WAS ENTERED IN THE BEECH CREEK RR. CO., THE ERIE & PITTSBURGH RR. CO. AND THE PENNDEL COMPANY.