596 F.2d 1102
 Bankr. L. Rep. P 67,103
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of the BANK OF NEW YORK, as successor trustee under
the New York Centraland Hudson River Railroad Company
Refunding and Improvement Mortgage datedOctober 1, 1913, in
Nos. 78-1692, 78-1693, 78-1694, 78-2316, 78-2317 and 78-2318.
Appeal of the IRVING TRUST COMPANY, as Indenture Trustee, in
Nos. 78-1698 and78-2314.
Appeal of Harriet SIGNER, Seymour Gillman, Anne Frank and
McMaster Holding Co., in No. 78-1716.
 Nos. 78-1692 to 78-1694, 78-1698, 78-1716, 78-2314, 78-2316
to 78-2318.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 16 and 17, 1978.
Decided Jan. 11, 1979.
 
 J. Donald McLeod, Dahlberg, Mallender & Gawne, Detroit, Mich., for appellant Manufacturers Nat. Bank of Detroit, as Indenture.
 Richard G. Elliott, Jr., Richards, Layton & Finger, Wilmington, Del., for appellant Wilmington Trust Co.
 Emil T. Bayko, White & Case, New York City, for appellant Bankers Trust Co.
 Mary Ellen Neylon, Tyler, Reynolds & Craig, Boston, Mass., for appellant Charles S. Jeffrey.
 Cletus P. Lyman, Lyman & Ash, Philadelphia, Pa., for Joseph A. Schafer.
 Larry M. Lavinsky, James J. Fuld, Philip M. Hahn, Gary B. Bettman, New York City, for appellant The Bank of New York, as Indenture Trustee; Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel.
 Stephen A. Weiner, Winthrop, Stimson, Putnam & Roberts, F. Martin Bowne, Windels, Marx, Davies & Ives, New York City, for appellant Irving Trust Co., as Indenture Trustee.
 Donald S. Reisman, Max Rothenberg, Hallandale, Fla., for appellants Harriet Signer, et al.
 Charles A. Horsky, W. Crosby Roper, Jr., Brice M. Clagett, Washington, D. C., James E. Howard, John J. Ehlinger, Jr., Philadelphia, Pa., for the Trustees of Penn Cent. Transp. Co.; Covington & Burling, Philip R. Stansbury, Wesley S. Williams, Jr., Wynne M. Teel, Washington, D. C., Carl Helmetag, Jr., Philadelphia, Pa., of counsel.
 Louis A. Craco, Willkie Farr & Gallagher, New York City, Frederic L. Ballard, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Institutional Investors Penn Central Group; Walter H. Brown, Jr., Thomas L. Bryan, Michael B. Targoff, Richard L. Posen, New York City, Vincent P. Hatton, Philadelphia, Pa., of counsel.
 George J. Wade, Shearman & Sterling, New York City, for Citibank, N.A., as Agent for the Committee of Secured Bank Creditors; Robert H. MacKinnon, Kenneth M. Kramer, New York City, of counsel.
 Morris Raker, Sullivan & Worcester, Boston, Mass., for Richard Joyce Smith, Trustee of the Property of the New York, New Haven and Hartford Railroad Co., Debtor; Joseph Auerbach, Boston, Mass., of counsel.
 Walter C. Kelley, Jr., Donald B. McCann, Margaret Anne Foster, Kelley, McCann & Livingstone, Cleveland, Ohio, for Board of Ed., Cleveland City School Dist.
 Jerome K. Walsh, Richard M. Auerbach, Walsh & Frisch, New York City, for appellee George W. Betz, Jr., Trustee of the Property of the Cleveland, Cincinnati, Chicago and St. Louis Railway Co., Secondary Debtor.
 Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 We deal in this opinion with appeals by two indenture trustees, representing four secured bond issues, from orders of the district court approving and confirming the Amended Plan of Reorganization of Penn Central Transportation Company (PCTC or the Debtor) and related debtors in reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205.[1] Judge Aldisert's opinion in In re Penn Central Transportation Co. (Reorganization Plan Appeals), 596 F.2d 1127, Nos. 78-1698/1700, 78-1702/03, 78-1710, 78-2311/12, 78-2314/15 and 78-2319/20 (3d Cir. January 11, 1979), filed simultaneously herewith, rejects challenges by other secured creditors to the Plan of Reorganization. Reference is made to that opinion for an account of the history of the proceedings, and a description of the debtor estates, the structure of the Plan, and the legal justifications for that structure. Judge Higginbotham's opinion in In re Penn Central Transportation Co., 596 F.2d 1155 (Stockholder Appeals ), Nos. 78-1715, 78-2321, and 78-2336 (3d Cir. January 11, 1979) rejects challenges to the Plan made on behalf of shareholders in the Penn Central Company, the Debtor's sole stockholder.
 
 
 2
 This opinion considers specific objections to the treatment of certain secured creditors.1a The Irving Trust Company is indenture trustee under a Collateral Trust Indenture dated April 15, 1965, made by New York Central Railroad Company (a predecessor of the Debtor) securing a claim of $7,800,000 principal amount of New York Central 6% Bonds due April 15, 1990 (the New York Central 6's). It is also trustee under a Collateral Trust Indenture dated April 15, 1968, made by Penn Central Company (a predecessor of the Debtor) securing a claim of.$7,641,800 principal amount of Penn Central 61/2% Bonds due April 15, 1993 (the Penn Central 61/2's). Finally, Irving Trust is successor indenture trustee under a First Mortgage dated July 1, 1892, made by The Mohawk and Malone Railway Company (a predecessor of the Debtor), which secures a claim of $1,489,000 principal amount of 4% Gold Bonds due September 1, 1991 (the Mohawk & Malone Bonds). Interest arrearages on the Mohawk & Malone Bonds total $478,000 as of December 31, 1977. The Bank of New York is successor indenture trustee under The New York Central and Hudson River Railroad Company Refunding and Improvement Mortgage of October 1, 1913 (the R & I Mortgage). That mortgage secures a claim of $214,470,000, representing $125,351,000 41/2% Series A Bonds and $89,119,000 5% Series C Bonds held by the public. Appellant Harriet Signer is a holder of R & I Bonds.
 
 
 3
 The indenture trustees representing these creditors do not object to the basic structure of the Plan of Reorganization, but only to the allocation of securities to them within that structure. The three Irving Trust issues all of which were accorded "super secured" status in the final Plan contend that the distributions proposed to be made to them under the Plan do not provide them with compensation that is the equitable equivalent of the well-secured claims that they will be required to surrender. Therefore, they contend, the Plan violates the rule of absolute priority, originally applied in diversity railroad equity receiverships, Northern Pacific Ry. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), and subsequently in proceedings under § 77 as well. E. g., Group of Institutional Investors v. Chicago, M., St. P. & Pac. R.R., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943). The R & I bondholders' more modest assertion is that the proposed distribution to them is insufficient because of the Plan's failure to treat certain assets of the estate as properly subject to the lien of the R & I Mortgage. We will deal with these distinct contentions separately under the captions "I. The Irving Trust Appeals" and "II. The R & I Appeal." Our resolution of these issues, which requires some modification of the distributions to these appellants, does not affect the confirmation or consummation of the Plan.
 
 I. THE IRVING TRUST APPEALS
 A. THE FACTUAL SETTING
 1. The Claims and Their Underlying Security
 
 4
 The claims of the two Collateral Trust Bond issues,[2] although they differ slightly in their details, are essentially similar. The New York Central 6's have a claim of $7,800,000 principal amount. As of December 31, 1977, accrued unpaid interest on the bonds amounted to $332,000. That claim is secured by 78,000 shares of the capital stock of the Pittsburgh & Lake Erie Railroad Co. (P&LE) pledged under the Trust Indenture. The P&LE is an independent, profitable railroad, 92.61% Of whose stock is held by the Debtor. None of the Debtor's P&LE stock was conveyed to ConRail pursuant to the Regional Rail Reorganization Act (RRRA). The Trustees treated the P&LE stock, for purposes of the Plan, as having a value of $100.15 per share, and the reorganization court, by confirming the Plan, implicitly approved that valuation.2a While there was conflicting evidence as to the value of the stock, we think that the Trustees' proposed valuation, approved by the reorganization court, is not clearly erroneous, and we adopt it here. In addition, the 6's are secured by $3,900,000 principal amount of R & I 5% Series C Bonds. In the Plan, these bonds are treated as secured by retained assets to the extent of 35.9% Of their face amount. Based on these figures, the value of the retained asset security underlying the claim of the New York Central 6's is $9,211,800. Their ratio of retained asset security to secured debt is thus 113.28%.
 
 
 5
 The Penn Central 61/2's have a claim of.$7,641,800 principal amount, and accrued interest as of December 31, 1977, of $353,000. The claim is secured by 83,698 shares of P&LE stock, and $4,185,000 principal amount of R & I 5% Series C Bonds. The value assigned this security under the Plan was $9,884,770, and the ratio of retained asset security to the total claim is 123.64%.
 
 
 6
 The Mohawk & Malone claim, including interest, totals $1,967,000. It was originally secured by all of the railroad's assets. In July, 1972, the Interstate Commerce Commission approved a petition by the Trustees to abandon the railroad's Lake Placid branch. In February, 1975, the State of New York condemned the abandoned line. Pending a final judicial determination of the condemnation award, the State of New York has paid over to the estate the sum of $3,900,000, representing its offering price less certain expenses. That sum, along with proceeds of sale of other encumbered assets, has been deposited in an escrow account which now totals $4,535,000. In addition the bonds are secured by other retained assets worth $850,000. Thus the total security for $1,967,000 is a first lien on $5,385,000 in assets. On the basis of escrowed cash alone this mortgage indenture is 230.55% Secured. Counting other retained assets it is 273.77% Secured.
 
 
 7
 2. The Proposed Distributions Under the Plan
 
 
 8
 As Judge Aldisert explains in greater detail in his opinion, the foundation of the Plan's distribution to secured creditors is the assumption that at the conclusion of the Valuation Case the estate of the Debtor will prove to be solvent. The Plan therefore treats each secured creditor as fully secured, regardless of the degree to which that creditor is secured by conveyed assets whose ultimate value to the estate is as yet undetermined. For every $100.00 of claim, each secured creditor receives a payment package consisting of 10% In cash, payable upon consummation, 30% In General Mortgage Bonds, 30% In Redeemable Preference Stock, and 30% Common Stock of the Reorganized Company.
 
 
 9
 Within this package, the Plan originally recognized the relatively stronger position of creditors fully or partially secured by retained assets through its formula for the distribution of General Mortgage Bonds. The Bonds were divided into Series A and B. Within the 30% Of the total distribution represented by the mortgage bonds, each secured creditor was awarded Series A Bonds in proportion to the degree that his claim was secured by retained assets of the Debtor. The remainder of the 30% Was satisfied with Series B Bonds. Thus, for example, a claim 70% Secured by retained assets would receive, for each $100.00 of claim, $21.00 in Series A Bonds and.$9.00 in Series B Bonds. Beginning in 1981, both series of bonds will bear interest at an annual rate of 7%. Series A Bonds are to be redeemed out of the proceeds of the sale of the Debtor's marketable retained assets, upon which the Plan gives them a claim ahead of the claim of the Series B Bonds. The Trustees' cash flow predictions indicate that the proceeds from the sale of these retained assets should be sufficient to retire all outstanding Series A Bonds and 11.25% Of the Series B Bonds by 1983, and to pay most of the interest on the Series B Bonds through 1987. The bulk of the Series B Bonds will, however, probably be redeemed principally out of the proceeds of the Valuation Case, in which their claim comes behind an estimated $1.278 billion of government and state and local tax claims. Series B Bonds not redeemed in the Valuation Case convert into Common Stock of the Reorganized Company. Series A Bonds come behind Series B Bonds in the Valuation Case. Series A Bonds that survive any shortfall in both the distribution from retained assets and the Valuation Case will remain as general obligations of the Reorganized Company.
 
 
 10
 Preference stock was originally proposed as a single issue to all secured creditors alike at a rate of 1.5 shares for every $30.00 of claim surrendered. Beginning in 1982, preference stock is redeemable out of the earnings of the Reorganized Company at a price of $20.00 per share, provided that the Reorganized Company's consolidated net income exceeds $50,000,000 and sufficient cash is available to cover the redemption. Up to 5% Of the total preference stock allocation may be retired each year in this fashion. If the income test is met, but no cash is available, the obligation to redeem will cumulate from year to year. The Trustees' figures show that the income test for redemption will be met in 1981, but there are no income or cash availability figures which would permit an educated estimate of the likelihood that preference stock will be redeemed from earnings in 1981 or in later years. Preference stock is also redeemable from the Valuation Case proceeds, with a claim subordinate to those of the federal government, the state and local taxing authorities, and the Series B and A Mortgage Bonds. Each share of preference stock has 2/3 of a vote in the shareholders' councils of the Reorganized Company. Any preference stock unredeemed at the end of the Valuation Case will convert to Common Stock in the Reorganized Company at the rate of one share of Common for every 6.5 shares of Preference Stock. Holders of preference stock also may, at their option, convert to common stock at the same ratio at any time prior to the close of the Valuation Case.
 
 
 11
 The Common Stock, which represents the last 30% Of face amount of each secured creditor's claim, remains entirely at the risk of the reorganized enterprise. Its present value is low. Its future value depends largely upon the fulfillment of two uncertain hopes: first, that the Valuation Case recovery will be sufficient to satisfy the massive prior claims of secured and unsecured[3] creditors and to produce an additional large bonus for the equity; and second, that the Reorganized Company, its assets heavily encumbered with past claims, will earn enough to retire its senior debt securities and produce a substantial equity for stockholders.
 
 
 12
 In the version of the Plan originally presented to the reorganization court, no provision was made for any classification of secured creditors other than that afforded by the division of General Mortgage Bonds into Series A and B. Before that court, however, a number of representatives of secured creditors, including Irving Trust, protested the proposed Plan's allocation of securities as violative of the absolute priority rule. Their contention was that since the Plan purported to be a fair and equitable compromise of the disputes that would have arisen in a litigated liquidation of retained assets, the allocation of compensation under the Plan should provide recognition of the stronger position of those mortgage bonds which, by virtue of the depth or position of their security, could demonstrate that they were likely to be paid off in full at the close of such a liquidation.
 
 
 13
 The reorganization court recognized the force of this argument. Applying the standards for the evaluation of compromises announced in Protective Committee for Independent Stockholders of TMT Trailer Ferry Association v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), it concluded that no secured creditor was assured of surviving a litigated liquidation. It also concluded, however, that a handful of bondholders were significantly more secured by retained assets than others, were considerably more likely to emerge from a litigated liquidation with payment of all or nearly all of their claim in cash, and therefore merited more consideration than the Plan provided them. Referring to that group of creditors as "super secured," it wrote:
 
 
 14
 The foregoing discussion leads to the conclusion that, generally speaking, the "super secured" creditors as a group receive appropriate allocations of retained assets for purposes of the A-B bond distributions under the Plan. All have retained asset coverage in excess of 100% Of the amounts of their claims, and the Plan accords the same treatment to all of these creditors. But while all of these creditors are on an equal footing, there is some merit in the suggestion that, in the vernacular, some are more equal than others. The Mohawk & Malone (011) mortgage has 275% Retained asset coverage, and the Gold Bond Mortgage has 243% Retained asset coverage. The New York Central 6% Bonds of 1990 and the Penn Central 61/2% Bonds of 1993 have retained asset coverage of approximately 119% And 131% Respectively, and they have the further advantage of the pledge of the Pittsburgh & Lake Erie stock. In my judgment it would be preferable to accord claimants under these four mortgages somewhat better treatment than the Plan provides, if that can be accomplished within the contours of the present Plan.
 
 
 15
 For the reasons discussed above, I am satisfied that no "super secured" claimant can properly lay claim to more cash or A bonds than the Plan provides. The alternative distribution scheme is invalid, and would not work. But within the framework of the present Plan, there is some room for flexibility in the handling of preference stock. Under the Plan, the selection of preference stock to be redeemed first is to be made by lot. While this is eminently fair as among holders similarly situated, it could, in actual operation, allow holders less favorably situated than the bondholders of these four mortgages to receive satisfaction of their claims before these more favorably situated bondholders. To prevent such an eventuality, in my judgment the solution is simply to include provisions guaranteeing that the holders of preference stock issued in exchange for the surrender of claims under the four mortgages listed above will have rights of redemption Pari passu which take precedence over the redemption rights of other preference shares.
 
 
 16
 In re Penn Central Transportation Co., 458 F.Supp. 1234, 1302 (E.D.Pa.1978).
 
 
 17
 The consequence of this decision was an amendment of the preference stock redemption features of the Plan. Two series of preferred stock were created, with Series A Preference Stock distributed to the four "super secured" creditors and Series B to all remaining creditors. As between the two Series, A Preference Stock has a first claim on both the income of the Reorganized Company and the proceeds of the Valuation Case. Since some redemption of some preference stock from the company's earnings is not unlikely, and since the relatively small amount of A Preference Stock ($34,337,000) will come ahead of all B Preference Stock ($523,715,000) in the Valuation Case, the value of the redemption preference afforded by classification in Series A is substantial. The three groups of bondholders represented by Irving Trust Company on this appeal were all designated as recipients of Series A Preference Stock. Thus, under the Plan, the three Irving bond issues each received a 10% Cash distribution, 30% Series A Bonds, 30% Series A Preference Stock, and 30% Common Stock.
 
 B. ANALYSIS
 1. The Issue and the Standard of Review
 
 18
 In a railroad reorganization the process of allocating the value of the debtor's estate to creditors is regulated by the so-called absolute priority rule. Group of Institutional Investors v. Chicago, M., St. P. & Pac. R.R., 318 U.S. 523, 546, 63 S.Ct. 727, 87 L.Ed. 959 (1943) (Institutional Investors ). The requirements of that rule have been precisely stated in 6A Collier on Bankruptcy P 11.06, at 210-11 (14th ed. 1977):
 
 
 19
 Under the absolute priority rule, a plan is not "fair and equitable" unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Any arrangement by which a junior class receives values allocable to a senior class "comes within judicial denunciation." Beginning with the topmost class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate.
 
 
 20
 (footnotes omitted). The application of this rule to proceedings under § 77 of the Bankruptcy Act is widely recognized[4] and is not contested here.
 
 
 21
 The function of the absolute priority rule is two-fold. First, the rule is intended to assure that the investment securities distributed as compensation under the Plan have a value at least roughly equivalent to the value of the claim surrendered. The reviewing court is therefore required to make "a comparison of the new securities allotted to (the claimant) with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old." Institutional Investors, supra, 318 U.S. at 566, 63 S.Ct. at 749. In addition, the rule commands that until senior creditors have received that "full compensatory treatment," Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 529, 61 S.Ct. 675, 85 L.Ed. 982 (1941), participation in the estate by junior creditors must be barred. RFC v. Denver & R.G.W.R.R., 328 U.S. 495, 517, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946); In re Central Railroad Co. of New Jersey, 579 F.2d 804, 810 (3d Cir. 1978). These standards of priority protect both the principal of and interest on the senior creditor's claim. Institutional Investors, supra, 318 U.S. at 546, 63 S.Ct. 727. They also shield a secured creditor's priority in his security up to the lesser of the full value of his security or the full value of his claim. In re Equity Funding Corp., 416 F.Supp. 132, 145 (C.D.Cal.1975).
 
 
 22
 Strict application of the foregoing principles would require that the process of compensating creditors in the run-of-the-mill corporate reorganization under the absolute priority rule proceed after the fashion of a liquidation, and it is tempting to demand of the reorganization process the kind of mathematical exactness that would result in such a case. There are, however, two important distinctions between liquidation and reorganization. First, in a reorganization the aggregate value of the debtor's assets is determined, not by a judicial sale, but by a hypothetical albeit expert calculation of their future worth to the enterprise. Second, claimants are satisfied not with cash, but with securities which reflect an apportionment of value in an ongoing business enterprise. It has long been recognized that these features of the reorganization process make it wholly unreasonable to expect that any plan will meet with precision the standards of the absolute priority rule. In every reorganization, numerous difficult issues of valuation must be resolved. The pressure of time and circumstance and the inherent uncertainty of forecasting the future of the enterprise seldom permit a certain determination of value.[5] On the distribution side, precise appropriation is necessarily handicapped by the recognized need to avoid overly elaborate and unstable capital structures.[6] These countervailing concerns find expression in the statutory requirement that reorganization plans must be "feasible," as well as "fair and equitable." Flexibility in the pursuit of feasibility has expressly been sanctioned by the Supreme Court:
 
 
 23
 The absolute priority rule does not mean that bondholders cannot be given inferior grades of securities, or even securities of the same grade as are received by junior interests. Requirements of feasibility of reorganization plans frequently necessitate it in the interests of simpler and more conservative capital structures. And standards of fairness permit it.
 
 
 24
 Practical adjustments, rather than a rigid formula, are necessary. The method of effecting full compensation for senior claimants will vary from case to case. . . . (W)hether in case of a solvent company the creditors should be made whole for the change in or loss of their seniority by an increased participation in assets, in earnings or in control, or in any combination thereof, will be dependent on the facts and requirements of each case. So long as the new securities offered are of a value equal to the creditors' claims, the appropriateness of the formula employed rests in the informed discretion of the court.
 
 
 25
 Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. at 528-30, 61 S.Ct. at 686-87 (footnotes omitted). Accord, Institutional Investors, supra, 318 U.S. at 565-66, 63 S.Ct. 727; Northern Pacific Ry. v. Boyd, supra, 228 U.S. at 508, 33 S.Ct. 554.
 
 
 26
 The need for a pragmatic approach to the allocation of asset values was particularly great in this case. In any chapter proceeding, the practical problems of valuing the debtor's estate (and, more particularly, of valuing the assets subject to the liens of individual secured creditors) and of achieving a workable distribution to creditors are hard ones. In this case, those difficulties were many times compounded. Normally, the assets of the estate encumbered and unencumbered are in hand and readily subject to valuation by traditional methods. Here, as a result of the conveyance to ConRail under the RRRA, assets with a book value of.$3.2 billion had passed from the estate prior to the preparation of the Plan. Many creditors of the estate were secured in substantial part by those assets. Any final determination of the value of these assets to the estate, and to the individual lienholders whose claims they secured, would have had to await the outcome of the Valuation Case now pending before the Special Court a resolution optimistically predicted to occur in 1987.
 
 
 27
 Creditors whose claims were secured by retained assets had the advantage that their security could be more readily valued. But even for creditors whose claims are secured by retained assets with a readily ascertainable market value, difficult problems of valuation remained. The special strength of such claims lay in the creditors' ability to realize the full value of the security at an early date in a liquidation. In this case, however, both the amount and timing of that realization were seriously in doubt. The prolonged deficit operations of the debtor had given rise to vast administration claims against the estate. Since by the terms of the conveyance to ConRail, the conveyed assets of the estate were transferred free and clear of all liens, these claims had been left behind to compete with those of the creditors secured by retained assets for the diminished portion of the Debtor's assets that remained. Thus, the $1,848,969,000 in retained assets of the Debtor and its subsidiaries (of which only $586,125,000 were unencumbered) were arguably called upon to answer approximately $1,000,000,000 in costs of administration. In consequence, the security of even the best secured retained asset creditors was at least arguably subject to invasion by priming administration claims. The extent of that potential invasion, however, turned on the resolution of a vast number of legal questions for which no precedent existed.
 
 
 28
 The Trustees faced a difficult choice. The only way to resolve these issues of valuation with precision would have been to litigate both the Valuation Case and the liquidation to a conclusion. It would in theory have been possible at the close of the Valuation Case to determine precisely the compensation awarded for each conveyed encumbered asset and to allocate that value to the appropriate mortgage interest. In the meantime, the distribution of the estate could have proceeded by means of an extended series of litigation in which the relative vulnerability of each security interest to claims of administration was finally determined in a court of law.
 
 
 29
 At the close of such a litigated liquidation, each secured creditor would have been granted a share of the debtor's estate precisely apportioned to the value of his security and reflecting a final judicial determination of his liability for administrative expenses. The cost of certainty, however, would surely have been very high. The reorganization court ably described the delay and confusion that would have attended such proceedings:
 
 
 30
 In their evidentiary submission, the Trustees have spelled out in some detail the major sources of potential litigation. These include the disputes concerning the relative priority of governmental claims, state, local and federal; the validity of the Pennco pledge agreement; a host of issues concerning the coverages of various mortgages and the correct application of marshalling principles; and what is perhaps the most significant but least understood problem, unraveling the intricate relationships between the Debtor and the Secondary Debtors. And even if these disputes could be finally resolved through litigation by the early 1980s, as the Trustees assume, there is another aspect of the matter which the Trustees appear to have somewhat underestimated. All of these disputes are interrelated. Generally speaking, the highest-priority claims must be finally resolved before distribution to lower classes could begin. For that reason, until the highest-priority claims are known, it is virtually impossible to determine correctly the treatment which lower classes of claims should receive. It is unlikely, therefore, that litigation of all of these major disputes could efficiently be pursued simultaneously. Stated otherwise, if the litigation proceeded simultaneously, it might well be necessary, upon completion of one round of litigation, to commence an entirely new round of litigation in order to determine how the results of the first round of litigation should be implemented (either in a Plan of Reorganization, or in the hypothetical liquidation distributions).
 
 
 31
 Until the validity and priority of the Government claims were finally determined through litigation, no distributions of any kind could be made. Until the issues surrounding the state and local tax claims were determined through litigation . . ., distributions to bondholders would seem unlikely. Perhaps more importantly, until the amount of the recovery in the Valuation Case became known, it would be impossible intelligently to work through the problem of allocating unpaid administration claims among the various mortgages, rendering distribution impossible. And until the Secondary Debtor issues were resolved, those assets would not be available for Penn Central creditors.
 
 
 32
 In re Penn Central Transportation Co., 458 F.Supp. at 1263-64. This delay might also have been accompanied by depletion of the estate. For example, any extended litigation ran the risk of tying up the liquidation of the marketable assets of the estate until after the expiration in 1983 of the Debtor's enormous tax-loss carry forwards a crucial asset of the estate. And the cost of conducting litigation both for creditors and for the estate would surely have been enormous.
 
 
 33
 The alternative was a plan, like the one ultimately adopted, in which the uncertainties imposed by the Valuation Case and the impact of administration claims were compromised in order to make possible an early and certain payout to senior creditors. Judge Aldisert has capably described the major compromises with the federal government, the state and local tax claimants, the Pennco pledgeholders, the New Haven Trustee and the Secondary Debtors that underlie the Plan. It is important to remember, however, that the terms extended to the Debtor's public investor creditors under the Plan were also the result of negotiated compromises. Thus the allocation formula first proposed to be applied to all secured creditors under the Plan was the result of a negotiated compromise between the Trustees and a consortium of institutional investors representing holders of a large percentage of the publicly held secured claims against the debtor. Although the creditor appellants in the instant appeals were not parties to that compromise agreement, under the Plan its terms were extended willy-nilly to them as well. In similar fashion, the proposed allocations to unsecured creditors and the Debtor's principal stockholder, the Penn Central Company, both of which the appellant creditors in these appeals heatedly protest, also result from negotiated compromises. In view of the alternative, it is clear that these compromises benefited the estate as a whole, and secured creditors in general. It is a different question whether these compromises truncated, in procrustean fashion, the rights of these particular bondholders to protect their strong positions in a litigated liquidation.
 
 
 34
 Compromise of disputes as part of a plan of reorganization is one of the "(p)ractical adjustments" approved by the Supreme Court in Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. at 529, 61 S.Ct. 675. The Court has recognized that "(i)n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) (TMT Trailer Ferry ). The power to compromise is usually applied to claims belonging to the estate rather than to those of senior creditors like the Irving Trust bondholders. E. g., TMT Trailer Ferry, supra; Consolidated Rock Products Co. v. DuBois, supra. But since the terms upon which a major claim of a distressed estate is settled may often determine whether or not a given creditor class is able to participate in the estate at all, we can see no difference in principle that would forbid an enforced compromise of even the most senior of claims.
 
 
 35
 That a particular compromise may be necessary or desirable, however, does not eliminate the statutory requirement that the plan be "fair and equitable." 11 U.S.C. § 205(e). Similarly,
 
 
 36
 (t)he fact that courts do not ordinarily scrutinize the merits of compromises . . . in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable.
 
 
 37
 TMT Trailer Ferry, supra, 390 U.S. at 424, 88 S.Ct. at 1163. It follows that when a senior creditor's claim is settled, the compromise must satisfy the rule of absolute priority as well. The reviewing court must determine that the value of the proposed compromise distribution is fairly equivalent to the value of the potential claim surrendered. For the reorganization court that determination demands the exercise of "informed, independent judgment." Id. The program for the exercise of that judgment is established in the TMT Trailer Ferry opinion:
 
 
 38
 There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.
 
 
 39
 Id. at 424-25, 88 S.Ct. at 1163. This statement of the standard of review demonstrates that the weighing of claim against compensation cannot be an exact one. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim. Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960); In re Equity Funding Corp., 416 F.Supp. 132, 146 (C.D.Cal.1975). We conclude that the reorganization court properly held that the test was whether the terms of the proposed compromise fall "within the reasonable range of litigation possibilities." In re Equity Funding Corp., supra, 416 F.Supp. at 145.
 
 
 40
 The reorganization court carefully considered the competing contentions of the three Irving Trust bond issues and the Trustees before approving the allocations that are at issue on appeal. Its exercise of "informed, independent judgment" is entitled to "especial weight" upon review. New Haven Inclusion Cases, 399 U.S. 392, 463, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); RFC v. Denver & R. G. W. R. R., 328 U.S. 495, 533, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946). In a similar situation, the TMT Trailer Ferry Court suggested in dictum that had the record in that case clearly indicated that the reorganization court had given "adequate and intelligent consideration" to the factors outlined above, its approval of a proposed compromise would have been affirmed, despite the presence in the record of virtually uncontested facts indicating "the probable existence of valid and valuable causes of action." 390 U.S. at 434, 438-39, 88 S.Ct. at 1171. These intimations, when coupled with the customary injunction that judicial findings of fact should not be overturned on appeal unless they are clearly erroneous, suggest that on all factual issues our review should be highly deferential. We think, however, that the issue of whether, viewing the facts in the light most favorable to the Plan, a particular legal theory is reasonably likely to succeed, is one on which our review must necessarily be plenary.
 
 
 41
 We turn then to the evaluation of the compromise enforced upon these senior creditors by the proposed Plan of Reorganization. We have already discussed the nature and value of the claims held by the three bond issues, and have described the package of securities distributed to them under the Plan. We now proceed, first, to review the evidence relating to the value of the distribution under the Plan. We conclude that on any theory of valuation, as a result of the compromise, the claims of the three issues have been substantially discounted in that distribution. We then consider whether the proposed discount of the Irving Trust claims falls within a range of "reasonably probable" outcomes in a litigated liquidation.
 
 2. Evaluating the Compromise Distribution
 
 42
 For each $100.00 of claim, the "super-secured" creditors receive $10.00 in cash, $30.00 face value of Series A Bonds, $30.00 face value of Series A Preference Stock and $30.00 face value of Common Stock. The reorganization court made no finding regarding the value of this distribution and that value is disputed upon appeal. The most significant evidence of value of distribution presented before the reorganization court related to the value of the Series A Bonds. The Trustees' expert witness testified that, even assuming the prompt retirement of A Bonds between 1978 and 1981 in accord with the proposed schedule, the present value of those future payments, given present interest rates, should be determined by applying a 16% Discount rate to the amount of payments. When applied, this rate produces a value of $75.62 for each $100.00 face amount of A Bonds, or $22.69 for every $30.00 of face amount.
 
 
 43
 Because the Series A Preference Stock was created only after the hearing and briefing on the Plan, there is no evidence in the record specifically relating to the value of A Preference Stock. On the most optimistic of assumptions, that is, assuming that the earnings test is met and cash is available, the majority of the Series A Preference Stock will be redeemed at $20.00 a share, on April 30, 1982. The remainder will be redeemed on April 30, 1983. Under no circumstances will the stock be redeemed before those dates, and there is an unknown but substantial likelihood that it will be redeemed later or not at all. In the interim, the stock bears no interest. Irving Trust argues that the present value of this contingent non-interest bearing promise to pay in the future should be determined by applying an 8% Discount rate to the face value of the obligation. Applying this rate, the value in January, 1978 of payment in 1982-83 is $14.18 per share, or $21.27 per $30.00 of claim.
 
 
 44
 These figures, when summed with the cash distribution, produce a present value of $53.96 per $100.00 of claim for the cash and debt security portions of the proposed distribution. The Trustees did not offer any evidence of value tending to contradict these figures, and on appeal they do not contest their accuracy. Rather, they contend that because the proffered evidence and analysis go to the issue of market value, they fall within the general prohibition against the use of market value as a measure of the worth of reorganization securities.
 
 
 45
 This argument has two prongs. First, the Trustees argue that evidence of market value should be ignored because the market can be expected irrationally to undervalue the securities of a once-distressed company emerging from a lengthy reorganization. In re Missouri Pac. R. R., 39 F.Supp. 436, 446 (E.D.Mo.1941); See also Blum, The Law and Language of Corporate Reorganization, 17 U.Chi.L.Rev. 565, 566-69 (1950). That argument has considerable force when the securities in issue represent equity in, or long term interest bearing obligations of, a reorganized debtor. In such cases, the market value of the security will depend upon the investing public's perception of the future prospects of the enterprise. That perception may well be unduly distorted by the recently concluded reorganization and the prospect of lean years for the enterprise in the immediate future. Use of a substitute "reorganization value" may under the circumstances be the only fair means of determining the value of the securities distributed. When, however, the security contract is in essence a short term, non-interest bearing promissory note, whose value is largely independent of the long term fortunes of the enterprise, arguments based on the irrationality of the market are less persuasive. It can scarcely be contended that the market in commercial paper functions irrationally when it discounts a non-interest bearing future promise to pay in order to obtain its present value. Nor can the market be assumed to be irrational in questioning the precise date of payment on these obligations. The Trustees' own expert witness has testified that those payments are in doubt. It is therefore difficult for us to see why the distressed company rationale requires or permits us to ignore this evidence of value. Plainly, the promise of a dollar payable in several years is not worth 100 cents today.
 
 
 46
 The Trustees also urge that the Supreme Court has disapproved, on grounds of practicality, the use of precise dollar values in the determination of equitable equivalence. They rely for this proposition chiefly upon Institutional Investors, supra, where the Court stated:
 
 
 47
 A requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process. . .
 
 
 48
 (The) determination (of equitable equivalence) cannot be made by the use of any mathematical formula. Whether in a given case senior creditors have been made whole or received "full compensatory treatment" rests in the informed judgment of the Commission and the District Court on consideration of all relevant facts.
 
 
 49
 318 U.S. at 565-66, 63 S.Ct. at 749. We think that the Trustees claim for this passage a meaning far broader than is warranted either by its context or by a fair reading of the absolute priority rule. The quoted statement was made in the context of a dispute concerning the proper compensation to be awarded to two parallel mortgages on different operating divisions of the debtor railroad. One division had historically been profitable; the other had generally lost money. The Plan proposed to consolidate both mortgages into an integrated financial structure. As Justice Douglas described it, the goal was "to fit each into the hierarchy of the new capital structure in such a way that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels." Id. at 563, 63 S.Ct. at 748. This problem of parallel valuation raised corporate finance issues of considerable sophistication. Moreover, the issues of valuation involved required that the Court review the Plan's proposed attribution of the corporation's future profit and loss to particular encumbered assets, as well as its estimate of the amounts of those profits and losses. The evidence bearing upon these issues of valuation was conflicting and complex. See id. at 559-61, 63 S.Ct. 727.
 
 
 50
 It was in the context of this difficult problem of valuation and distribution that Justice Douglas stated that the use of dollar values "would create an illusion of certainty" and unduly burden the reorganization process. The wisdom of that position, in context, is indisputable. But it is not apparent that this statement was intended for universal application. First, Justice Douglas was careful to stress that the contest between the two mortgages was not one between senior and junior creditors, where the rule of absolute priority would have applied, but rather one between two first liens on different assets. Id. at 562-63, 63 S.Ct. 727. Second, the valuation issues in dispute were extremely complex and subject to substantial conflicting evidence. Here, in contrast, the valuation problem presented is relatively simple, and the evidence bearing upon it is clear and uncontradicted.[7] Recognizing this evidence would pose no burden on the reorganization process. Finally, in the absence of Any other evidence in the record bearing on the value of the debt issues we question whether meaningful review would be possible if this evidence of value were not recognized. Surely we cannot be expected to review the proposed allocations under the Plan on the patently false assumption that these non-interest bearing debt securities have a "reorganization value" equal to their face value despite their deferred maturities. Some discount must be recognized, and no basis for taking account of that discount other than that proposed by Irving Trust has been suggested either in the reorganization court or on appeal. Moreover, we think that Irving's proposed discount rates are reasonable. The 16% Discount rate applied to the Series A Bonds was suggested by the Trustees' own expert witness. In light of this concession, the 8% Discount rate which Irving suggests should be applied to the more speculative A Preference Stock is conservative, and for that reason we do not think that the fact it was not formally presented before the district court prevents us taking notice of it here.
 
 
 51
 The Irving's proposed values for the debt securities must, therefore, in the absence of other conflicting evidence, be given substantial weight on this appeal. We do not, however, regard the precise dollar figures proposed as controlling. We are under no illusion that the apparently mechanical application of a particular discount factor produces results so precise that they ought, in close cases, to swing the decision of a reviewing court. But on any reasoned review of the evidence, Irving Trust has established that the cash and fixed dollar securities, bonds and preference stock, distributed under the Plan have a value no greater than 55-60% Of the face value of the claim surrendered.
 
 
 52
 We cannot, however, agree with Irving Trust's further contention that a precise dollar value can be placed on the Common Stock of the reorganized debtor for purpose of valuing the entire securities package. Such a valuation, which necessarily depends heavily upon the long term performance of the reorganized debtor and the uncertain outcome of the Valuation Case, falls within the prohibition against reliance upon market value which usually applies to reorganization securities. We do think, however, that the Irving Trust's proposed $6.00 per share valuation, which assumes no recovery from the Valuation Case and weak earnings performance by the debtor, can usefully be viewed as establishing a floor for the value of the Common Stock. If this is the case, then the minimum value of the proposed distribution to super secured creditors is in the range of $60.00 to $65.00 per $100.00 of claim. Further recovery, up to and perhaps in excess of 100 cents on the dollar, will be wholly contingent upon outstanding performance by the reorganized debtor and a large recovery in the Valuation Case.
 
 3. The Impact of Administration Claims
 
 53
 The foregoing analysis of the value of the proposed distributions frames the issue. The appellant creditors are required to surrender the right to defend security amounting to 113%, 123% And 274%, respectively, of their claims in a litigated liquidation, plus the right to recover for any shortfall as a secured creditor in the Valuation Case. In return, they receive a distribution which has an assured value no greater than 65% Of their claim, and a speculative right to benefit from a large recovery in the Valuation Case and high future earnings up to, and perhaps in excess of, that claim. For purposes of review, we will assume that the right to recover in the Valuation Case as a secured creditor is in some broad sense equivalent to the possibility of recovering an amount greater than that claim as a common stockholder of the Reorganized Company. Leaving these elements of the claim aside, the core question, thus, is whether the proposed guaranteed recovery of 65 cents for each dollar of claim represents a fair compromise of the potential claims against the retained security of the three bond issues.
 
 
 54
 In a litigated liquidation, the security backing the Irving Trust issues could be subject to potential invasion from four sources: Claims of the federal government, pre- and post-petition claims of state and local tax claimants, and other costs of administration. We think that on a "worst case" analysis all of these claims except those for pre-petition taxes might reasonably be found to prime the security of the three Irving Trust bond issues.
 
 
 55
 The obligations to the United States creditors comprise: $56,200,000 principal and interest due on Trustees' Certificates held by the United States and in default since 1976; $51,800,000 of Trustees' Certificates guaranteed by the United States and due in 1986, and $368,100,000 due to the United States Railway Association (USRA) for loans made pursuant to section 211(h) of the RRRA. These debts are costs of administration entitled to first priority. "Had the United States not provided the funds to pay, the trustees would be dealing with an equal amount of unpaid obligations held by a multitude of individual creditors and suppliers. . . . (T)he United States is both equitably and legally fully entitled to rights incident to an unpaid administrative debt." Staff Report of the SEC on Plans of Reorganization 81, Joint App., Vol. I, Book 3 at A-1200. In a litigated liquidation the United States could reasonably contend that its claims were entitled to priority ahead of other costs of administration and of secured creditors. With respect to claims of state and local taxing authorities, which make up the bulk of other costs of administration, the priority of federal claims is made clear in the statute, 45 U.S.C. § 721(h)(1), (3)(B) (1976 Supp.), and its legislative history, See H.R.Rep.No.1743, 94th Cong., 2d Sess. 34-35, Reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 5837, 5846, 5857-58. With respect to secured creditors the case for federal priority emerges implicitly from the provisions of the RRRA. In terms, § 211(h) does not specify how much of the debtor's property is to be primed by loans made pursuant to the statute. Other portions of § 211, however, suggest an arguable contention that the government intended to take a lien on All of the debtor's property. Section 211(e), for example, which delineates the prerequisites for § 211(h) claims, provides that before any loans are extended, the United States Railway Association must make a finding in writing that, Inter alia, "the applicant has offered such security as the Association deems necessary to protect reasonably the interests of the United States." Section 211(f) provides, in addition, that:
 
 
 56
 (f) Policy. It is the intent of Congress that loans made under (the) section shall be made on terms and conditions which furnish reasonable assurance that the Corporation or the railroads to which such loans are granted will be able to repay them within the time fixed and that the goals of this chapter are reasonably likely to be achieved.
 
 
 57
 45 U.S.C. § 721(f). Plainly, the government wished substantial assurances that its loans would be repaid.
 
 
 58
 The Irving Trust bondholders contend, however, that the possible federal priority could not reasonably have been intended to reach non-operating assets like their collateral. A reasonable argument can be made, however, that even non-operating assets were primed by the federal claims. The debtor's Operating assets were surely an unlikely source for such repayment since they had produced no profits for years. It seems likely that the government was looking to the non-operating assets for its security. This view of congressional intention is reinforced by the reality that non-operating assets like the Park Avenue Properties were long recognized as vital contributors to the continued operations of the railroad. Thus, in adjudicating the demands of Penn Central creditors that certain properties of the debtor not be sold, this court quoted with approval from the Penn Central Merger Cases, 389 U.S. 486, 510-11, 88 S.Ct. 602, 614, 19 L.Ed.2d 723 (1968):
 
 
 59
 While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move.
 
 
 60
 In re Penn Central Transportation Co., 484 F.2d 323, 330 n. 37 (3d Cir.), Cert. denied, 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973). With this holding in mind, it seems reasonable to conclude that the debtor's non-operating assets were intended to be subject to the government's lien for RRRA administration expenses. If so, then the Irving Trust bonds were primed by $476.1 million of federal claims.
 
 
 61
 Irving Trust points out that even if the federal claims were held to prime its security, those claims could be fully satisfied from $586,125,000 in unencumbered assets of the debtor. Indeed, the bondholders argue, the unencumbered assets of the estate would, in addition, be sufficient to pay off almost all of the $118,000,000 of other administrative costs (exclusive of state and local taxes) of the reorganization as well, leaving their security essentially unimpaired.
 
 
 62
 The bondholders contend, however, that their potential liability on a worst case basis is limited to the federal government claims. Conceding, as they must, that both the $118,000,000 of other administrative costs and the $449,800,000 of state and local tax claims are costs of administration entitled to first priority in this proceeding, the Irving Trust bondholders argue that under settled principles of bankruptcy law, these costs may not be assessed against their security absent a showing that the security was benefited by the claim. In re Lehigh Valley Railroad Co., 558 F.2d 137 (3d Cir. 1977); Central Railroad Co. of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir.), Cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970); 5 Collier on Bankruptcy P 77.21 at 611 n.21 (14th ed. 1978). This rule is, as Collier points out, simply an adaptation to the reorganization context of the general principle applicable under section 64 of the Bankruptcy Act, 11 U.S.C. § 104 (1976). See 6A Collier on Bankruptcy P 13.14(2) at 635 (14th ed. 1977).
 
 
 63
 As it applies to the security of the Collateral Trust Bonds, this argument has two weaknesses. First, the R & I Bonds, which make up a principal element of their security, are in turn secured by the most junior lien upon real property of the debtor which would probably be held liable for both taxes and costs of administration. And as to the P&LE Bonds, we think that the bondholders too cavalierly assume that in a litigated liquidation no finding of benefit to their security could be made. The value of the P&LE stock is, after all, dependent upon the financial health of the P&LE itself. That railroad interconnects closely with the Penn Central system, and a large portion of its earnings no doubt arise from traffic which passes over that system. In addition, the P&LE realizes substantial income from leasing its excess equipment to other railroads in the Northeast. Both of these aspects of the P& LE's profitable business, we think, might reasonably have been found to depend, in substantial part, upon the continued operation of the Northeast rail system that this reorganization made possible. A finding that the Collateral Trust bonds benefited from the reorganization seems far from improbable.
 
 
 64
 The Mohawk & Malone bonds, which are secured by assets of a railroad which ceased to operate in 1972, have a stronger claim to resist the incursion of administration claims, since it is difficult to see how that security benefited at all from the continued operation of the system after that date. But both the Collateral Trust security and the Mohawk & Malone security were arguably rendered subject to administration claims as a result of the condemnation of the Debtor's assets by the RRRA. That statute compelled the debtor to continue operations despite overwhelming evidence that the Debtor was not reorganizable on an income basis, and relegated secured creditors to the Valuation Case for any losses that resulted from those operations. A reasonable argument can be made that the effect of this compelled continuation of operations was to elevate the expenses essential to those operations such as property taxes and other costs of administration to a position where they would prime secured creditors and relegate those creditors to the Valuation Case.
 
 
 65
 In its worst case analysis, the reorganization court also assumed that $73,400,000 of pre-petition state and local taxes might prime secured creditor security in retained assets. We do not agree that this result was reasonably probable. No court would be likely to hold that unpaid pre-petition taxes "benefited" secured creditors. Moreover, it is difficult to conceive of such taxes being treated as expenses of administration in a § 77 or any other bankruptcy proceeding. However, such taxes are given a fourth priority in § 64, and although that section is not generally applicable under § 77, it has been held to apply to tax claims in those proceedings, at least so far as to permit priority over general unsecured creditors.[8] It has never been suggested, however, that a § 64 tax priority primed a lien, probably because of the proviso in § 64.
 
 
 66
 (t)hat no order shall be made for the payment of a tax assessed against any property of the bankrupt in excess of the value of the interest of the bankrupt estate therein . . . .
 
 
 67
 The bankrupt estate has no equity in any retained assets covered by the Irving Trust and Bank of New York indentures. Since neither statutory nor caselaw authority suggests an argument whereby the $73,400,000 in pre-petition taxes would prime secured creditors, there is no reasonable likelihood of that result in litigation. If there is any claim in the taxing authorities it can amount to nothing stronger than that with respect to specific assets some taxing authorities have statutory liens valid under state law against mortgagees. On the record before us, however, there is no indication that any of the retained assets to which Irving Trust and Bank of New York primarily look are subject to such liens in significant amounts. Thus for the purpose of evaluating litigated liquidation possibilities we conclude that even a worst case result would place the bulk of the $73,400,000 in pre-petition tax claims behind the liens of their indentures.
 
 
 68
 Summarizing, the claims which the district court could reasonably have concluded would prime the Irving Trust bondholders in a litigated liquidation are as follows:
 
 
 69
 Federal claims $476,100,000
State & Local Taxes $449,800,000
Other Costs of Administration $118,000,000
 --------------
 Total $1,043,900,000
 
 
 70
 In a worst case liquidation, the appellants argue, this $1,043,900,000 would be assessed against the consolidated assets of the debtor and the leased lines, which total $1,848,969,000, of which $586,125,000 is unencumbered, and $1,262,844,000 encumbered. In such a liquidation, the unencumbered assets would be reduced to roughly $805,069,000 or 64% Of their original total value.
 
 
 71
 This is not, however, the true worst case analysis. In their submissions to the reorganization court, the Trustees outlined a scenario in which all of the above priority claims, plus the pre-petition taxes, were assessed against the retained assets of the primary Debtor, PCTC, alone, excluding the assets of the Secondary Debtors. In that eventuality, the court concluded that all of the Debtor's unencumbered assets would have been consumed, and $615,000,000 of the $925,971,000 of the debtor's retained encumbered assets would have been consumed as well. While such an analysis surely involves numerous draconian assumptions, it presents a truer worst case analysis than that proposed by the bondholders. Adopting a similar approach, we calculate that to assess the $1,043,900,000 of potentially priming claims against the $1,425,494,000 of retained assets of the Debtor alone would swallow all unencumbered assets and would reduce retained secured assets from $925,971,000 to $381,594,000 41% Of all encumbered retained assets at the close of a liquidation. With these possible worst case outcomes in mind, we turn to the specific situation of the three bond issues.
 
 
 72
 In a worst case litigated liquidation like the one described above, the New York Central 6's would be severely at risk. Their claim is 113.28% Secured. But 17% Of that security is in R & I Bonds, whose value, because of their junior lien position, would almost certainly be wiped out in such a liquidation. The claim is thus effectively secured roughly 100% By the P&LE stock. The foregoing analysis makes clear that that security would be subjected in the "worst case" to massive priming claims which might reduce it to as little as 41% Of its value. Under the circumstances, we cannot say that a proposed distribution constituting roughly 60% Of their claim does not represent a fair and equitable compromise of the litigation possibilities.
 
 
 73
 A similar conclusion applies to the Penn Central 6's. They are slightly better secured than the New York Central bonds (123% To 113%), but not in an amount so much greater as to avoid the impact of the foregoing analysis. We think that the proposed distribution is a fair compromise of their claim to survive the liquidation.
 
 4. The Mohawk & Malone Bonds
 
 74
 The Mohawk & Malone Bonds, however, present a wholly different case. They are 273.77% Secured by retained assets. Even assuming that fully 60% Of their security was found to be primed by the priority claims outlined above, more than 100% Of their claim would remain secured, and they would be entitled to receive the full amount of that claim at the close of the liquidation. On any more moderate assumption their claim would remain much more than 100% Secured. We think therefore that the Plan's proposed distribution is not, as to them, a fair and equitable compromise within the reasonable range of litigation possibilities.
 
 
 75
 The reorganization court, without addressing the particular strength of the Mohawk & Malone claim, referred to timing as a factor. Undoubtedly it is. But a secured creditor is entitled to be paid in full with interest to the date of payment. On any realistic appraisal of the length of time a litigated liquidation might take, even on a worst case basis it is very likely that this group of bondholders would receive both principal and interest in full. It seems to us inconsistent with the TMT Trailer Ferry ruling to tender to them a package of securities in which some forty percent of their claim is converted to common stock of concededly contingent value.
 
 
 76
 We conclude that the Plan must be modified to improve the distribution to the Mohawk & Malone Bondholders. In this regard Irving Trust suggests that the fairest solution is to allow the Mohawk & Malone claim to be satisfied in full out of the escrowed cash that is its security. While a strong argument might be made for such treatment, we think it is undesirable to establish a precedent that secured creditors may demand cash satisfaction for the secured portion of their claim upon consummation of the plan. If such a principle were recognized, we see no reasoned distinction between the right of a creditor who can show that he is 100% Secured by retained assets in a worst case liquidation to a 100% Cash settlement of his entire claim and that of a creditor who can show that he would be at least 30% Secured by retained assets to a 30% Cash settlement. As the Trustees suggest, such a requirement of cash satisfaction would be inconsistent in principle with feasibility requirements. See Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 117, 60 S.Ct. 1, 84 L.Ed. 110 (1939).
 
 
 77
 The preferable solution is to award the Mohawk & Malone Bondholders Series A Bonds for the 90% Of face amount of their claim that is to be satisfied in reorganization securities. Of all the securities issued under the Plan, A Bonds have the best likelihood of prompt and certain payment. On the other hand, it is also true that the Series A Bonds, which have deferred maturities and carry no interest until 1981, cannot fairly be valued at their face amount. Mathematical precision, however, is not to be expected of any plan of reorganization. We think that given the limited range of securities in the present plan, our proposed award of Series A Bonds represents the best means short of a direct cash payment of assuring that these bondholders receive an award that is the equitable equivalent of their surrendered claim.
 
 II. THE R & I APPEAL[9]
 
 78
 The $214,470,000 claim of the R & I Mortgage was treated under the Plan as fully secured, but not supersecured. Thus, unlike the Mohawk & Malone and Collateral Trust bondholders, the R & I bondholders are allocated Series B Preference Stock for 30% Of their claim. The Bank of New York, as indenture trustee for the R & I mortgagees, does not contest this allocation. It does object, however, to the allocation to its claim of Series A and B bonds. As we noted above, Series A Bonds are allocated under the Plan to the extent that a claim is secured by retained assets.[10] The R & I indenture trustee urges that in calculating its share of A Bonds the reorganization court significantly underestimated the value of its security in retained assets. That security, in relevant part, is said to be found in three sources. The first is a junior mortgage lien on what, throughout these proceedings, has been described as the Park Avenue properties, and on the rental stream generated by them.[11] The second is a pledge of 163,426 shares of the capital stock and 26,591 shares of the preferred stock in the New York and Harlem Railroad Company, which owns the fee upon which the debtor has a long-term lease ("the Harlem lease"), a condition of which is the payment of dividends on the stock. The third is a lien on all indebtedness, liens or charges acquired by the debtor against any company, a majority of whose shares are subject to the R & I Mortgage.
 
 
 79
 A. THE PARK AVENUE RENTALS AND HARLEM STOCK DIVIDENDS
 
 
 80
 During the course of the reorganization, the Trustees collected from Park Avenue tenants approximately $76 million of rentals, net of property taxes but before certain maintenance expenses, depreciation and amortization of leasehold improvements.[12] Although these rentals secured the R & I Mortgage (and others), they were entirely expended during the reorganization. Twice during that process the R & I indenture trustee requested that the rents be sequestered, and twice that request was denied. The Bank of New York now contends that the R & I mortgagees should have been granted retained asset credit for the Park Avenue rentals expended by the Trustees in support of deficit rail operations.
 
 
 81
 The indenture trustee also claims retained asset credit for dividends due but not received on the Harlem Stock pledged under the R & I mortgage. The Harlem lease obliges the debtor to pay to Harlem, as part of its rent, $5 per annum for each share of Harlem stock, representing the amount of Harlem's annual dividend. The debtor is not required to make such dividend rental payments on shares pledged to the R & I indenture trustee, however, except upon default under the terms of the pledge. Since the debtor did default, the indenture trustee was, during the course of the reorganization, entitled to Harlem dividend payments. But in 1972, in granting the petition of the Trustees to affirm the Harlem lease, the reorganization court ruled that until its further order the Trustees should not pay the rentals needed to pay dividends on the stock pledged to the R & I mortgagees. Thus, while under the indenture the R & I trustee was entitled to receive the dividends, approximately $7.1 million was withheld. This occurred despite the fact that dividends on Harlem stock held by the public were paid throughout the reorganization.
 
 
 82
 Objections to the diversion of rentals and dividends, identical to those offered by the Bank of New York as successor trustee under the R & I mortgage, have heretofore been presented to this Court. In In re Penn Central Transportation Company (Park Avenue Properties), 484 F.2d 323 (3d Cir.), Cert. denied, 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973), Judge Adams wrote:
 
 
 83
 (The indenture trustee) asserts that because these shares have passed from the Penn Central to the mortgage trustee as a result of the default, it is entitled either to receive the dividends accrued and those that come due or to have these claims ranked as an administrative claim.
 
 
 84
 The district court, relying on this Court's opinion in In re Philadelphia & Reading Coal & Iron Co., (117 F.2d 976 (3d Cir. 1940)) held that the income produced by the pledged shares was available to the Trustees of the Penn Central and need not be paid to the pledgee. Having thus denied the claim for immediate payment, the district court deferred a determination of the status to be accorded (the R & I) claim until the formulation of the reorganization plan. We affirm these holdings of the district court.
 
 
 85
 484 F.2d at 335-36. That decision plainly forecloses any contention that rentals and dividends may not be invaded for reorganization purposes. The case does not, however, decide how a secured creditor whose income stream has been involuntarily diverted for operating expenses should be compensated for that diversion. It clearly leaves open for future determination the contention that, just as holders of trustees certificates are treated as administration expense claimants, so too these involuntary lenders should be given similar treatment under the Plan.
 
 
 86
 The indenture trustee's claim for compensation for the loss of income stream security is particularly striking in contrast to the treatment of creditors whose security was in the proceeds of the sale of mortgaged properties. Such proceeds were required to be escrowed and are now available as retained assets. See In re Penn Central Transportation Company (Selkirk Yard), 474 F.2d 832 (3d Cir. 1973). The Bank of New York points to this apparent inequity as a basis for granting it additional retained asset credit.
 
 
 87
 The Trustees respond to this contention by asserting an ostensible distinction between Income from mortgaged property, and Proceeds from the Sale of mortgaged property. The former, they assert, has always been available for the debtor's use during reorganization, while the latter's use is, "in general, not permissible." Trustees' Brief, at 78. In support of this proposition, the Trustees cite Selkirk Yard, supra. Id. But that case supports no such distinction. In Selkirk Yard Judge Adams permitted the Trustees of Penn Central to use monies from the sales of mortgaged properties in connection with the improvement of a major switching yard. Significantly, however, he not only endorsed the reorganization court's order that the Trustees replace the principal borrowed from the proceeds of those sales; he also insisted that the Trustees pay interest on the funds, at the market rate, for the period of time that the funds would not themselves be drawing interest. 474 F.2d at 837. Thus, the court recognized that there is no essential difference between security in the escrow fund and security in the income stream which the fund produces.
 
 
 88
 More recently, in In re Lehigh Valley Railroad Co., 558 F.2d 137 (3d Cir. 1977), we had occasion to reiterate our view that there is no material distinction, for reorganization purposes, between income and proceeds from sales. In Lehigh Valley, the court considered the claims of certain bondholders for the sequestration of rents from mortgaged property, and held that the four-pronged test of Central Railroad of New Jersey v. Manufacturers Hanover Trust Company, 421 F.2d 604 (3d Cir.), Cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970), was applicable. In so ruling, Judge Forman wrote:
 
 
 89
 We can find no legal justification for the disparate treatment in these proceedings of proceeds from the sale of mortgaged property, and the interest thereon, and income from the rental of mortgaged property. Nor do we discern any reason for the application of different standards in the two instances. There is nothing in § 77 from which one may infer an intent to distinguish between property and income derived therefrom. See In re Philadelphia & Reading Coal & Iron Co., 117 F.2d 976 (3d Cir. 1941).
 
 
 90
 558 F.2d at 148-49.
 
 
 91
 Selkirk Yard and Lehigh Valley, taken together, establish that there should be no difference in treatment between those creditors holding security in property and those holding security in an income stream produced by the property.[13] In Lehigh Valley, moreover, we relied upon In re Philadelphia & Reading Coal & Iron Co., supra. The latter case holds that " the right of the mortgage trustee ultimately to receive the income of the mortgaged and pledged property . . . (becomes) fixed on . . . the day the petition for reorganization (is) approved by the court . . . ." 117 F.2d at 978. In the instant case, the security which the R & I bondholders had in the two income streams in question on the date of approval of the petition for reorganization was diverted to pay operating expenses, and thus to reduce administration expenses arguably priming the retained asset security of other creditors. With respect to those other creditors, then, fair and equitable treatment would seem to require some recognition that, starting out equal, the R & I bondholders have been made less secure and the others more so. It is a settled principle of reorganization law that a mortgagee whose security has been dissipated for reorganization purposes is entitled to equitable treatment in a plan of reorganization in compensation for that loss. E. g., In re Yale Express Sys., Inc., 384 F.2d 990, 992 (2d Cir. 1967); In re New York, New Haven & Hartford R., 147 F.2d 40, 48 (2d Cir. 1945).
 
 
 92
 If this were an ordinary reorganization, we think it would be necessary to treat the security diverted to operating expenses no worse than other costs of administration incurred for such purposes, or at least to equalize in some manner the treatment of secured creditors whose assets were dissipated and those whose assets were retained. This, however, is not an ordinary reorganization. Here, after the reorganization court determined to use the R & I security for reorganization purposes, Congress passed the RRRA, which in effect condemned a large part of the debtor's estate. That action effectively relegated some creditors to the security of a Tucker Act remedy. Many of the claims being asserted in that proceeding are for the expenditure of security in the deficit operation of the railroad. Thus, a number of creditors have suffered the same sort of invasion of their security as did the R & I bondholders. The former might argue that they should be treated no less favorably than the latter. There is, however, a difference. The decision to divert the income stream securing the R & I bonds was made by the reorganization court, and approved by this court in the Park Avenue Properties appeal, at a time when the Trustees still contemplated a capitalized earnings plan of reorganization. The diversion was also well before the RRRA mandated the apparent inequity. To be sure, with the passage of the RRRA, the reorganization court could not do other than to relegate the targets of the condemnation to the proceeds of the Valuation Case. But it need not compound inequities by abandoning the original understanding upon which it authorized the Trustees to use the rental and rental dividend income. The eventuality of the RRRA should not shield from scrutiny the fact that creditors holding security in escrowed proceeds of sale, for example, are being given unexpectedly better treatment, not only than the creditors whose assets the government condemned, but also than those whose assets the trustee borrowed. To the extent that the estate has retained assets, the fair and equitable standard of § 77(e) governs. One aspect of that standard is that a creditor whose claim is the equivalent of an administration expense claim is entitled to be paid ahead of secured creditors who benefited from the expenditure. Clearly, the invasion of the R & I income stream security did benefit the holders of retained asset security by shielding them, to the extent of the expenditure, from erosions. Moreover, § 77(e) requires that holders of like security be treated equally. While that may not be possible when the government condemns property, it is required when the Trustees and the reorganization court selectively choose security for impairment in the course of a reorganization.
 
 
 93
 We conclude, therefore, that the reorganization court's rejection of the R & I bondholders' claim for recognition of their security in the Park Avenue rentals and Harlem rental dividends cannot be approved. But on the present record it is not possible to determine precisely the extent to which such recognition is required. To the extent that the rentals collected from the Park Avenue properties were reinvested in improvements in those properties which increased their value, there has not been an impairment of the R & I bondholders' security. The reorganization court, having rejected the indenture trustee's claim, had no occasion to calculate the value of such reinvestment, if any.[14] Moreover, while the Trustees concede that they collected $76 million in rentals, it is clear that even if these rentals had been sequestered, they would necessarily have been reduced by the costs associated with their collection. These costs include maintenance, depreciation, and administrative services, burdens which were borne entirely by the Trustees. They should be deducted in determining the actual invasion of the R & I security. When such a net calculation is made, a fair and equitable treatment of the R & I bondholders would be to allocate to them Series A Bonds in proportion to the degree that their retained asset security is thereby increased.
 
 B. THE LIEN ON INDEBTEDNESS OF LEASED LINES
 
 94
 The R & I indenture trustee's third claim for an increased allocation of Series A Bonds is predicated upon a provision in the indenture giving the R & I bondholders a lien on the indebtedness to Penn Central of any company a majority of whose stock is pledged to the trustee under the R & I mortgage. This clause, it is said, gives the indenture trustee title to an administration expense claim against leased lines which were, during the reorganization, operated by the Trustees at a substantial loss for the account of the lessors. If the indenture has this effect, the argument continues, then that administration expense claim primes the interests of those secured creditors whose security is in the retained assets of the debtors owning those lines.
 
 
 95
 The reorganization court rejected this argument for at least two reasons.[15] First, it observed that even if there were an administration expense claim for losses in the operation of leased lines, it would not be the property of Penn Central, but rather the property of the Trustees. The court reasoned that any operating losses which might give rise to chargeback claims were made possible by the reorganization process, and by funds made available from the Penn Central estate as a whole. As the reorganization court stated, "(t)o say that this detriment suffered by the estate as a unit should now be redressed, but only for the benefit of the R & I Mortgage, is to express a strange view of the appropriate exercise of the equitable powers of a federal court." In re Penn Central Transportation Co., 458 F.Supp. 1234, 1305 (E.D.Pa.1978).[16] It concluded, moreover, that the draftsmen of the R & I indenture had no intention of producing the anomalous result of subordinating the security of third-party creditors of the leased lines to the claim of the R & I bondholders. We find these reasons persuasive and agree with the reorganization court that the claim for chargebacks was properly rejected.
 
 CONCLUSION
 
 96
 The order confirming the plan of reorganization must be affirmed in all respects except two. The appeal of Irving Trust Company as indenture trustee under the Mohawk & Malone Railway Company first mortgage dated July 1, 1892 requires that the case be remanded to the reorganization court for modification of the Plan of Reorganization in a manner consistent with Part I of this opinion. The appeal of the Bank of New York as successor indenture trustee under the New York and Hudson River Railroad Company Refunding and Improvement Mortgage of October 1, 1913 requires that the case be remanded for further proceedings with respect to its claim for recognition of its interest in the Park Avenue rentals and Harlem dividend rentals consistent with Part II of this Opinion.
 
 
 
 [1]
 In re Penn Central Transp. Co., 458 F.Supp. 1234 (E.D.Pa.1978) (Approval Opinion); In re Penn Central Transp. Co., 458 F.Supp. 1364 (E.D.Pa.1978) (Confirmation and Consummation Opinion ). Unless otherwise noted, all citations herein are to the Approval Opinion
 1a Judge Aldisert's opinion contains a complementary discussion of the appeals filed by the Irving Trust as indenture trustee for the two Collateral Trust Bond issues.
 
 
 [2]
 Portions of this discussion parallel, in slightly greater detail, the account of the Collateral Trust claims contained in Judge Aldisert's opinion in the Reorganization Plan Appeals
 2a Even if a higher value were recognized for the P&LE stock, our view is that the impact of potential priming claims is so substantial as to render immaterial any difference between the values proposed by Irving Trust and those proposed by the Trustees. See pp. 1120-1121, Infra.
 
 
 [3]
 Unsecured creditors receive Certificates of Beneficial Interest for 30% Of their claims. These Certificates are redeemable out of Valuation Case proceeds after the Preference Stock. If not so redeemed, they will be cancelled. The remainder of each unsecured creditor's claim is reimbursed in Common Stock
 
 
 [4]
 E. g., RFC v. Denver & R.G.W.R.R., 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946); Institutional Investors, supra; Ecker v. Western Pacific R.R., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 (1943). The absolute priority rule also applies in proceedings under Chapter X of the Bankruptcy Act, and so cases decided under that statute are relevant here as well. See Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 473 n.11, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974)
 
 
 [5]
 See Institutional Investors, supra, 318 U.S. at 561-66, 63 S.Ct. 727; Cf. Nashville C. & St. L. Ry. v. Browning, 310 U.S. 362, 370, 60 S.Ct. 968, 84 L.Ed. 1254 (1940) ("(R)ailroads, unlike farms and city lots and stocks and bonds, are not objects of exchange. The very notion of a 'full cash value' for a railroad is in many respects artificial. . . . Whatever may be the pretenses of exactitude in determining such a 'value' to claim for it 'scientific' validity, is to (use) the term in its loosest sense." (citation omitted))
 
 
 [6]
 See Ecker v. Western Pac. R.R., supra, 318 U.S. at 476, 63 S.Ct. 692; Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. at 528, 61 S.Ct. 675
 
 
 [7]
 Similarly in RFC v. Denver & R. G. W. R. R., 328 U.S. 495, 517, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946), also relied upon by the Trustees as authority for their position, the records apparently contained sharply conflicting evidence of value. Were such evidence in the record here, we would, of course, have deferred to the conclusions of the finder of fact, as did the Court in RFC, supra
 
 
 [8]
 E. g., In re Denver & R. G. W. R. R., 23 F.Supp. 298 (D.Colo.1938); In re New York, O. & W. Ry., 25 F.Supp. 709 (S.D.N.Y.1937); In re Missouri Pac. R. R., Bankr.L.Rep. (CCH) P 3780 (E.D.Mo.1935), Aff'd sub nom. J. P. Morgan & Co. v. Missouri Pac. R. R., 85 F.2d 351 (8th Cir.), Cert. denied, 299 U.S. 604, 57 S.Ct. 230, 81 L.Ed. 445 (1936)
 
 
 [9]
 Our disposition of the contentions offered by the Bank of New York as indenture trustee for the R & I bondholders applies equally to those offered by Harriet Signer, et al., bondholders under the R & I Mortgage, who have separately appealed but present identical objections to the Plan
 
 
 [10]
 Under the Plan the R & I bondholders are considered 31.9% Secured by retained assets. The distribution to them is as follows:
 
 
 [11]
 These New York City properties include the Waldorf Astoria, Biltmore, Barclay, Roosevelt and Commodore Hotels, and the Bankers Trust, American Brands, Pan Am, Westvaco, Union Carbide, Chemical Bank, ITT, Graybar, and Manufacturers Hanover office buildings. The properties and liens thereon are described in detail in In re Penn Central Transportation Company, 354 F.Supp. 717 (E.D.Pa.1972), Aff'd in part, modified and rev'd in part, 484 F.2d 323 (3d Cir.), Cert. denied, 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973)
 
 
 [12]
 This figure represents rentals collected between June 30, 1970 and December 31, 1976. See Joint App., Vol. II at A-349. The Trustees do not dispute its accuracy. Trustees' Brief at 75
 
 
 [13]
 There is, to be sure, some support in past decisions of this court for the Trustee's claim that income from property is more vulnerable to depletion for reorganization purposes than are proceeds from the sale of mortgaged property. See Webster, Collateral Control Decisions in Chapter Cases: Clear Rules v. Judicial Discretion, 51 Am.Bankr.L.J. 197, 216-21 (1977) (citing cases). But this position has been roundly criticized by commentators, See, e. g., id. at 216; Countryman, Real Estate Liens in Business Rehabilitation Cases, 50 Am.Bankr.L.J. 303, 334 (1976), and rejected by subsequent Third Circuit decisions. See, e. g., Selkirk Yard, supra; Lehigh Valley, supra. See also In re Pittsburgh-Duquesne Development Co., 482 F.2d 243 (3d Cir. 1973)
 
 
 [14]
 On remand we would direct the court's attention to a June 22, 1977 memorandum, purporting to value the improvements made in the Park Avenue properties at $16,371,000. Joint App., Vol. II at A-350
 
 
 [15]
 The reorganization court advanced as a third basis for rejecting this contention the fact that the debtor may not have actually rejected the leases in question, and thus no chargeback right against the leased lines ever arose. Because of our disposition of the court's other reasons for denying the R & I claim for chargebacks, we express no view on this issue
 
 
 [16]
 The court's conclusion that chargeback rights belong to the trustee of the estate, in view of his role as a manager of the debtor's reorganization, seems amply supported by related case and statutory law. A trustee is appointed to supervise the reorganization of a railroad pursuant to 11 U.S.C. § 205. He is given legal title to the railroad's property for the special purpose of rehabilitating the company. See, e. g., Thompson v. State of Louisiana, 98 F.2d 108, 110 (8th Cir. 1938). That title is exclusive and thus, for example, a debtor railroad corporation is not liable for personal injuries caused by negligent operation of the railroad by the trustees. Detwiler v. Chicago, R. & P. Ry. Co., 15 F.Supp. 541 (D.Minn.1936). Among the powers which are vested in the trustee, consistent with his function of reorganizing the company, is the power to reject leases. See generally In re Penn Central Transp. Co., 382 F.Supp. 821 (E.D.Pa.1974), Aff'd, 510 F.2d 969, 970 (3d Cir. 1975); In re Hoboken Mfrs. R. Co., 56 F.Supp. 187 (D.N.J.1944), Aff'd, 150 F.2d 921 (3d Cir. 1945), Rev'd on other grounds sub nom., Smith v. Hoboken R. R., Warehouse and Steamship Connecting Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). Once such a lease is rejected, the operation of the leased line is for the account of the lessor. 11 U.S.C. § 205(c)(6) (1946); In re Penn Central Transp. Co., 382 F.Supp. 821, Aff'd, 510 F.2d 969, 970 (3d Cir. 1975). It seems plausible to assume that the power to reject a lease, which is vested in the trustee so as to further the reorganization of the debtor, includes within it the power to supervise the operation of the leased lines and effect any chargeback which arises. Since this entire procedure is mandated by exigencies of reorganization, it is unlikely that Section 77 contemplated the preemption of the chargeback funds by prior lienholders